1

2

3

4

5

6                       UNITED STATES DISTRICT COURT

7                  FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9    DAVID E. BRISTOW                      No. 2:19-cv-1816 JAM DB

10                   Petitioner,

11          v.                             FINDINGS AND RECOMMENDATIONS

12   STATE OF CALIFORNIA,

13                   Respondent.

14

15          Petitioner, a state prisoner, proceeds pro se and in forma pauperis with a petition for a writ

16   of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges a judgment of convictions entered

17   on March 28, 2014 in the Yolo County Superior Court. Petitioner stands convicted of conspiracy

18   to commit murder, attempted murder, assault, and associated enhancements. Petitioner claims that

19   the prosecutor's peremptory challenges to three Hispanic prospective jurors were based on group

20   discrimination and violated his due process and equal protection rights under the Fourteenth

21   Amendment. For the reasons set forth below, this court recommends denying the petition.

22                                   **BACKGROUND**

23   **I.    Facts Established at Trial**

24          The California Court of Appeal for the Third Appellate District provided the following

25   summary of the facts presented at trial:

26                The evidence of guilt is extensive. Defendants do not claim the jury's
                  verdict lacks substantial evidence to support it. We summarize the
27                most cogent portions of the record supporting the verdict as well as
                  those portions relevant to the arguments raised on appeal.
28

                                            1

**a. Motive. Family Matters: The Relationship Between Cullen and Defendants**

The victim, Cullen, met Stearman's niece, Deana Stearman, in 2006 or 2007. Cullen and Deana began a relationship, and Deana moved in with Cullen and his son.[] The couple married, and at the wedding Cullen met Stearman. Cullen and Deana had two children, a boy born in 2009, and a girl in 2011. Over the years, Cullen saw Stearman at family functions on numerous occasions.

Theirs was not a happy marriage. In 2010 Deana was arrested for domestic violence. Cullen was once arrested after slapping Deana and leaving a bruise on her temple. After Deana gave birth to their second child, she moved in with her parents, Doyle and Madeline Stearman. Cullen lived a few houses away in a home rented from Deana's parents but eventually moved.

In April 2011 Cullen went to court over visitation. The court issued a temporary order requiring the couple's son to stay with Cullen and their daughter to stay with Deana. The couple also exchanged custody for one hour every other day at a nearby gas station. During these exchanges, Deana's parents accompanied her.

The acrimony between the couple was fully exposed to the Stearman family. A month or two before the attack, Deana and other Stearmans were in Bakersfield for her grandfather's funeral, on a weekend Cullen was scheduled to visit the children. When Cullen called to speak with his children, Stearman got on the phone and said, "You don't want me to come down there." Cullen felt Deana was not complying with the court order over visitation. He took Stearman's remark as a threat.

Deana's father, Doyle is Stearman's brother. Doyle was aware of the ongoing custody dispute between Stearman and Cullen. Deana lives with Doyle and has custody of the children most of the time. When the family returned from Bakersfield, Cullen arrived to pick up the children. Doyle told him to wait because he wanted the sheriff to be present at the exchange. Because of the animosity between Cullen and the Stearman family, Doyle wanted a neutral witness. On another occasion, the following week, Doyle contacted the sheriff's department complaining of Cullen's violation of the custody agreement.

Stearman treated Cullen as a threat to the family. He once stayed at Doyle's home when Doyle and his wife went out of town because Cullen had made threats and they did not trust him. Doyle had a handgun for protection. Stearman gave Doyle a nine-millimeter semiautomatic handgun in a holster. In the house when Doyle and his family left town were a single action .22 caliber and the semiautomatic nine millimeter that Doyle received after his father's funeral in Bakersfield.

The last time Cullen saw Stearman prior to the attack was the weekend before when he went to pick up his children at Doyle's house. Stearman was very hostile and told Cullen he had better take

2

care of what is "owed."

**b. The Attack**

Around midnight on September 30, 2012, Cullen left to work his midnight to 8:15 a.m. shift. Although Cullen believed the tire pressure on his van was low, he was late and drove on. As he drove, a white Toyota pickup passed him, a vehicle he had seen near his house when he left for work. The pickup sped past him and then stopped.

Cullen stopped his van in the middle of the road. A person Cullen did not recognize got out of the passenger side of the pickup and ran to Cullen's van. The person wielded a gun and yelled at Cullen to get out of the van, pounding the gun on the passenger side window.

Cullen got out of the van and tried to run. Stearman, the driver of the pickup, ran to stop him. Stearman punched Cullen in the face and he fell to the ground. As Stearman punched him, Cullen felt a gun at the back of his head and heard Stearman yelling, "shoot him, shoot him." The gun went off and Cullen collapsed.

Cullen saw two bright lights and heard voices asking if he was dead. Someone said, "I will finish him off." Cullen began struggling with Stearman. Stearman pointed a gun at Cullen's chest. They struggled and the gun went off, hitting Cullen in the left arm and exiting through his chest. After the shooting, the slide of Stearman's gun remained "stuck in the open position" and Stearman began to curse.

Cullen felt fingers in his mouth, bit down, and felt a knife cutting his tongue. Cullen's tongue was lacerated and his neck was cut from his mouth to behind his right ear. Stearman and the other attacker took Cullen's van.

As Cullen got to his feet, he heard an engine revving. A car came toward Cullen, striking him, and he slid onto the hood and onto the windshield. The driver got out, pulled Cullen off the windshield, and threw him to the ground. Cullen did not recognize his assailant. The person said, "Die, bitch." There was red fluid on the hood and the windshield.

Cullen's cell phone rang. His coworker, Victor Bustamante Navarro, was calling because Cullen had not shown up for work. Cullen told Bustamante he was dying and told him where he was. Cullen then called 911. [] Although the wound to his tongue made Cullen difficult to understand, he said he was dying and Danny had done it.

Bustamante and Miguel Ambriz found Cullen in the middle of the road, covered in blood. Bustamante had not called 911 after speaking to Cullen because he did not know the extent of Cullen's injuries. Bustamante called 911 after reaching the scene.

An officer arrived and asked Cullen who had attacked him. Cullen said his ex-wife's father and attempted to say a last name. Bustamante could not understand what Cullen was trying to say, but it started

3

with an "S" and sounded like "Searman" or "Silverman." Cullen said something about his ex-wife and father. Cullen had previously mentioned his divorce and subsequent custody issues to Bustamante.

**c. The Law Enforcement and Medical Response**

Sheriff's deputies Nick Morford and Andrew Livermore arrived on the scene. Cullen's face and neck were covered in blood, and Morford saw deep cuts on his neck, throat, hands, and wrists. Cullen told Morford he was dying and that he had been carjacked and stabbed. Bustamante told Morford that Cullen said his ex-wife and uncle, or ex-wife and father, were involved in the attack. Morford asked Cullen if his ex-wife was involved and Cullen replied, "Danny Steelman." When Morford repeated the name, Cullen confirmed it was Danny Steelman.

Officers located Cullen's van and found blood on the front bumper, hood, and cracked windshield. The driver's window was open, the keys were in the ignition, and the rear passenger tire was flat.

A DNA swab taken from the van's headlight switch was a mixture of two contributors: Cullen, the major contributor to the DNA profile, and Stearman, the minor contributor.

Cullen suffered a six-inch cut to the right side of his neck, a slash wound to his chest, and massive blood loss. He also suffered a bullet wound to his neck. The bullet entered Cullen's mouth, went through his tongue and out the back of his neck, or went through his neck through his tongue and out of his mouth. Cullen also had bullet fragments in his neck. Cullen's wound was consistent with a .22-caliber round. Such a weapon was found in Cullen's van.

While in the intensive care unit, Cullen tried to tell officers what happened, but his injuries prevented communication. Eventually, Cullen was able to communicate with Detective Jennifer Davis by blinking in response to questions. He also communicated via a notepad and identified Stearman as one of his attackers but could not identify his second assailant.

**d. Stearman's Arrest**

Officers arrested Stearman on October 9, 2012, and codefendant Bristow on June 12, 2013.

(ECF No. 21-28 at 3–7); People v. Stearman, No. C076323, 2018 WL 1614701, at *2–4 (Cal. Ct. App. Apr. 4, 2018).

## II.   Procedural Background

### A.   Judgment

Petitioner and co-defendant Stearman were tried together but had separate juries. A jury

1   convicted petitioner of conspiracy to commit murder, attempted murder, assault, and associated

2   enhancements. (ECF No. 21-2 at 237–47, 251–61.) The trial court imposed an aggregate prison

3   term of forty years to life. (ECF No. 21-3 at 97, 100, 102–05.)

4   **B.   State Appeal and Federal Proceedings**

5          Petitioner timely appealed his convictions, and the state appellate court affirmed the

6   judgments. (ECF No. 21-19.) Petitioner sought review in the California Supreme Court. (ECF No.

7   21-20.) The California Supreme Court granted review and transferred the case "to the Third

8   District Court of Appeal for reconsideration in light of *People v. Gutierrez* (2017) 2 Cal.5th

9   1150." (ECF Nos. 21-21 & 21-22.) On reconsideration, the state appellate court remanded the

10   case to permit the trial court to review the firearm enhancement, but otherwise affirmed the

11   judgments. (ECF No. 21-28.) Petitioner again sought review by the California Supreme Court,

12   which summarily denied review. (ECF No. 21-30.) The trial court subsequently denied

13   petitioner's motion to modify his sentence. (ECF No. 21-31.)

14          The present petition was filed on July 21, 2019. (ECF No. 1.) Respondent has filed an

15   answer. (ECF No. 22.)

16   **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

17          A court can entertain an application for a writ of habeas corpus by a person in custody

18   under a judgment of a state court on the ground that he is in custody in violation of the

19   Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal writ is not

20   available for an alleged error in the interpretation or application of state law. See Wilson v.

21   Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); Park v.

22   California, 202 F.3d 1146, 1149 (9th Cir. 2000) (stating that "a violation of state law standing

23   alone is not cognizable in federal court on habeas.").

24          This court may not grant habeas corpus relief unless the adjudication of the claim:

25          (1) resulted in a decision that was contrary to, or involved an
26          unreasonable application of, clearly established Federal law, as
             determined by the Supreme Court of the United States; or

27          (2) resulted in a decision that was based on an unreasonable
28          determination of the facts in light of the evidence presented in the
             State court proceeding.

5

28 U.S.C. § 2254(d). For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405–06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). But it may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam) (citing Parker v. Matthews, 567 U.S. 37 (2012)); see also Carey v. Musladin, 549 U.S. 70, 76–77 (2006). Nor may circuit precedent be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Marshall, 569 U.S. at 64.

A habeas corpus application can invoke § 2254(d)(1) in two ways. First, a state court decision is "contrary to" clearly established federal law if it either applies a rule that contradicts a holding of the Supreme Court or reaches a different result from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405–06). Second, "under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 120 S. Ct. at 1522; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a

6

condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 786–87.

A petitioner may also challenge a state court's decision as being an unreasonable determination of facts under § 2254(d)(2). Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012). Challenges under this clause fall into two categories; first, the state court's findings of fact "were not supported by substantial evidence in the state court record," or second, the "fact-finding process itself" was "deficient in some material way." Id.; see also Hurles v. Ryan, 752 F.3d 768, 790–91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process may be deficient and the state court opinion may not be entitled to deference.). Under the "substantial evidence" category, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012) (quoting Taylor v. Maddox, 366 F.3d 992, 999–1000 (9th Cir. 2004), overruled on other grounds by Murray v. Schriro, 745 F.3d 984, 999–1001 (9th Cir. 2014)). The "fact-finding process" category, however, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146–47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact-finding process unreasonable. Id. at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008) (en banc). For claims upon which a

1   petitioner seeks to present new evidence, the petitioner must meet the standards of 28 U.S.C. §

2   2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State

3   court proceedings" and by meeting the federal case law standards for the presentation of evidence

4   in a federal habeas proceeding. See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

5        This court looks to the last reasoned state court decision as the basis for the state court

6   judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

7   "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from

8   a previous state court decision, [this court] may consider both decisions to 'fully ascertain the

9   reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

10  banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)). "When a federal claim

11  has been presented to a state court and the state court has denied relief, it may be presumed that

12  the state court adjudicated the claim on the merits in the absence of any indication or state-law

13  procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be

14  overcome if "there is reason to think some other explanation for the state court's decision is more

15  likely." Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court

16  decision rejects some of petitioner's claims but does not expressly address a federal claim, a

17  federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on

18  the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013). When it is clear that a state court has

19  not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. §

20  2254(d) does not apply, and a federal habeas court reviews the claim de novo. Stanley, 633 F.3d

21  at 860.

22                          **ANALYSIS**

23       Petitioner argues that the state court erred by rejecting his argument that the prosecutor's

24  use of peremptory challenges on three Hispanic prospective jurors was unconstitutional.

25  **I.   State Court Opinion**

26       Petitioner raised this claim in his direct appeal. In the last reasoned state court decision,

27

28

8

1  the California Court of Appeal considered and rejected the claim:[1]

2          Bristow argues the trial court erred in denying his *Batson/Wheeler*
3  motion. According to Bristow, the prosecutor's use of peremptory
   challenges on three prospective Hispanic jurors was improper.

4          ***Background***

5          <u>Voir Dire</u>

6          At the beginning of voir dire, the court stated it would permit each
7  side 30 minutes to question the first 20 jurors. Defense counsel asked
   that voir dire not be limited, but the court disagreed. The court
8  proceeded to question prospective jurors as to whether any knew of
   the parties or witnesses or the basic facts of the case. Bristow focuses
9  on the questioning of three jurors with Hispanic surnames: E.S.,
   R.G., and N.C.

10         The court questioned prospective juror E.S. E.S. served on a jury in
11 a criminal case two years previously. The court asked: "Do you
   remember what the charge was?" E.S.: "Somebody got beat up. I
12 don't recall." The court: "Did the jury come to a decision in that
   case?" E.S.: "I believe so." The court: "Were you involved in the
13 deliberation process?" E.S.: "Yes."

14         The court also elicited biographical information from the prospective
   jurors. R.G. served as a senior administrative analyst with the
15 Department of Employment and Social Services. E.S. worked for a
   distribution center. N.C. served as director for the Head Start
16 Program, and her spouse worked for a rental agency.

17         After defense counsel questioned the panel, the prosecutor
   questioned the panel, noting the time constraints. The prosecutor told
18 the panel: "If I don't ask you an individual question, it is not because
   I mean to slight you, it is just that I'm trying to speed this along as
19 much as I can." The prosecutor proceeded to question several
   potential jurors.

20

21         The prosecutor used a peremptory challenge to excuse E.S. and two
22 other jurors. Defense counsel later excused two jurors. Subsequently,
   both the prosecutor and the defense counsel each excused two jurors.

23         After the court added more potential jurors, it noted, "I'm giving the
24 attorneys less time to ask questions. They took so little time the first
   time around, they have some time left." The court, the prosecutor,
25 and defense counsel questioned the new jurors individually. The
   prosecutor and defense counsel each excused a juror. In the next
26 round defense counsel excused a juror and the prosecutor excused

27    [1] Petitioner suggests that the state courts did not issue a reasoned decision on his claim. (ECF No.
28 1 at 12–13.) He is mistaken. The California Court of Appeal adjudicated his claim on the merits
   as detailed above, and he is limited to that claim on federal habeas review.

N.C. In the following round, defense counsel and the prosecutor each excused a juror. Defense counsel then excused a juror and the prosecutor excused R.G. Defense counsel informed the court, "I have a Batson Wheeler."

The Hearing

At the hearing, defense counsel alleged the prosecutor used peremptory challenges on three prospective jurors. The court asked the prosecutor to explain why the three jurors were excused.

The prosecutor stated N.C. was excused mainly because none of her answers "gave us any kind of reading about how she would vote one way or another." The prosecutor noted N.C. worked for Head Start and her husband worked for a rental agency. However, with the limited amount of time for questioning, nothing N.C. "told us in the Court's questioning gave us rise one way or another to what type of juror she would be. [¶] A lot of times ... when we've been sitting here through selection, even when we don't specifically question a juror, the answers they've given the Court have been enough for us to determine. [N.C.'s] answers were so benign that we chose to exercise a peremptory challenge based upon the lack of information she provided and not wishing to waste any additional of our finite amount of time in trying to hash out one way or another. So that's why [N.C.] was excused."

The prosecutor stated he excused R.G. for several reasons: "One ... her facial expression brought to me that she was completely confused almost to the point of disoriented about what was going on. ... So first off, she appeared to be confused throughout the entire time I could observe her in the jury box. Second, she works for the Department of Employment and Social Services. I know from my experience as a deputy district attorney going on over 16 years that the relationship between DESS and the DA's office is often one of acrimony. I know from experience there have been times where DESS has actually complained that badge-carrying, gun-carrying district attorney investigators are assigned to that office, and those investigators work for my office."

In addition, the prosecutor noted R.G. described her position as a senior analyst with the DESS: "In my experience as a prosecutor, those people involved as senior analysts tend to be too fact wanting or too detail specific and are not good as jurors in cases where some of the evidence produced is going to be circumstantial evidence. For example ... there is a significant gap in time in the cell phone records that apply to [Bristow]. We are going to ask the jury to follow circumstantial evidence to conclude what [Bristow] did during the time that we do not have cell phone records for him. And in my experience, economist analysts are not good for that task. And we're going to be asking them to do a task like that? [¶] I would also note that by my count, of course, the jurors have all left. We have four Hispanic jurors seated in the group of 12 that still remain, and those are four Hispanic surnames. ... [¶] So I would submit that even if [defense counsel] has raised a prima facie case to warrant a Batson Wheeler inquiry, our explanation for those jurors being dismissed

10

certainly shows beyond a doubt that our reasons for kicking them are for facts related to the case and have absolutely nothing to do with their race."

The trial court considered the challenge to E.S. and determined there was a legitimate reason to excuse the juror. Defense counsel stated that the fact that there were four Hispanics remaining on the jury was "legally irrelevant." The court responded: "Well, I certainly agree with you, but it is not immaterial. It is simply not conclusive."

Although the court said it was not necessary, the prosecutor provided an explanation for the challenge to E.S.: "Just for purposes of the record and for any purpose of appeal, [E.S.] was asked about prior jury experience. [E.S.] said he had prior jury experience two years ago and recalled nothing of that prior jury service. That to me is problematic because we are looking for a group of 12 people plus alternates who are going to be paying attention and be engaged. I have no idea what kind of case that was, but with only one prior event of jury service, I would expect something to stick out in his mind if he was the type of juror we were looking for in this case, which is one to engage and follow along in a trail of facts both involving direct and circumstantial evidence."

The court noted there were four individuals with Hispanic surnames among the 11 potential jurors remaining. The court concluded: "The importance of counting the number of people with Hispanic surnames is simply to underline the fact that in this jury pool, we have a very substantial number of Hispanics, which is not unusual for Yolo County. Based on the information provided, I would find, first, that the reason [E.S.] was excused clearly has nothing to do with race. The reason why [R.G.] was excused certainly makes sense based on what [the prosecutor] said. And the reason [N.C.] was excused, while it nonplusses me a bit, has nothing to do with race. I don't find that explanation offered by [the prosecutor] is simply an attempt to mask the fact that the real reason was that she was Hispanic. So I would deny the Batson Wheeler objection based on everything in the record."

### Discussion

Bristow contends the prosecutor's "inconsistent, implausible, and unsupported reasons for exercising three of its first nine challenges against Hispanic jurors did not offer substantial evidence to support the trial court's finding of nondiscrimination." On this issue, the Supreme Court transferred the case back to us for reconsideration in light of its opinion in *People v. Gutierrez* (2017) 2 Cal.5th 1150 (*Gutierrez* ).)

The exercise of a single peremptory challenge solely on the basis of race or ethnicity violates equal protection under the Fourteenth Amendment to the federal Constitution. (*Batson*, supra, 476 U.S. 79.) Exclusion of even one prospective juror for reasons impermissible under *Batson/Wheeler* constitutes structural error and requires reversal. (*People v. Silva* (2001) 25 Cal.4th 345, 386.)

11

A *Batson/Wheeler* motion necessitates a three-step process. First, the defendant must demonstrate a prima facie case by showing the totality of the facts gives rise to an inference of a discriminatory purpose. (*People v. Avila* (2006) 38 Cal.4th 491, 553.)

Second, if such a showing is made, the burden shifts to the prosecutor to give an adequate non-discriminatory explanation for the challenges. To meet this burden, the prosecutor must provide a clear and reasonably specific explanation of the legitimate reasons for the challenges. (*Batson, supra*, 476 U.S. at p. 98.)

Third, if such a showing is made, the trial court must determine whether the defendant has proven purposeful discrimination. The defendant must show it was more likely than not that the prosecutor's challenge stemmed from an improper motivation. The inquiry focuses on the subjective believability of the stated reasons, not the objective reasonableness. The credibility of the prosecutor's explanation becomes pertinent and the court may consider the prosecutor's demeanor, the reasonableness or improbability of the explanation, and whether the prosecutor's reasons have some basis in acceptable trial strategy. The court must make a sincere and reasoned effort to evaluate the prosecutor's justification, considering the facts of the case, acceptable trial tactics, and observations of the prosecutor's examination of potential jurors and the subsequent exercise of peremptory and for-cause challenges. Explanations that are implausible or fantastic may be determined to be pretexts for purposeful discrimination. The trial court has the advantage of being in the courtroom to assess the prosecutor's credibility. (*Gutierrez, supra*, 2 Cal.5th at pp. 1158–1159.)

We review the trial court's decision on the sufficiency of the prosecutor's justifications with great restraint. In addition, we presume the prosecutor's use of peremptory challenges occurs in a constitutional manner. In reviewing the trial court's ruling on the *Batson/Wheeler* motion we apply the substantial evidence standard, giving deference to the court's conclusions if the court made a reasonable evaluation of the prosecutor's proffered justifications. (*Gutierrez, supra*, 2 Cal.5th at p. 1159.)

In *Gutierrez*, the defendants joined in a *Batson/Wheeler* motion on the grounds that of 16 peremptory strikes, 10 were against Hispanic potential jurors, with four of the strikes being consecutive. The trial court reviewed eight of the 10 proffered justifications, did not individually review the striking of two prospective jurors, and made a "global finding" that the prosecutor's strikes were neutral and nonpretextual. (*Gutierrez, supra*, 2 Cal.5th at pp. 1156–1157.)

The court considered the circumstances surrounding three Hispanic panelists that were the subject of the defendants' *Batson/Wheeler* motion and focused on one of the potential jurors, Juror No. 2723471. The prosecutor removed the juror because she was from Wasco and said she was not aware of any gang activity. In addition, the prosecutor was unsatisfied by some of the juror's answers as to how she would respond when she learned one of the prosecution's witnesses belonged to a Wasco gang. The trial court accepted the "

'Wasco issue' " as justification for the prosecutor's peremptory challenge. (*Gutierrez, supra*, 2 Cal.5th at pp. 1160–1161, 1168.)

The Supreme Court found the stated reason for the juror's removal failed to satisfy the third step of *Batson/Wheeler*: the credibility of the prosecutor's neutral explanation. "The prosecutor may have conveyed the gist of his concern—that he was uncertain how a prospective juror's unawareness of Wasco gang activity might bear on her response to Trevino—but his explanation left some lucidity to be desired. ... They [the People] assert, 'The fact that a potential juror is unaware of the activity of gangs in Wasco could cause that juror to be biased against Trevino who would testify to the contrary.' In consideration of the record of voir dire, such a deduction is tenuous. It is not evident why a panelist's unawareness of gang activity in Wasco would indicate a bias against a member of a gang based in Wasco." (*Gutierrez, supra*, 2 Cal.5th at p. 1169.) The court also noted the prosecutor asked no follow up questions and the juror disclosed she had relatives in law enforcement and corrections. The record demonstrated that the prosecution viewed familial ties to law enforcement as a generally desirable characteristic. (*Id.* at pp. 1169–1170.)

The trial court also ran afoul of *Batson/Wheeler*: " 'When the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient.' [Citation.] The court here acknowledged the 'Wasco issue' justification and deemed it neutral and nonpretextual by blanket statements. It never clarified why it accepted the Wasco reason as an honest one. Another tendered basis for this strike, the reference to the prospective juror's 'other answers' as they related to an expectation of her reaction to Trevino, was not borne out by the record—but the court did not reject this reason or ask the prosecutor to explain further. In addition, the court improperly cited a justification not offered by the prosecutor: a lack of life experience. On this record, we are unable to conclude that the trial court made 'a sincere and reasoned attempt to evaluate the prosecutor's explanation' regarding the strike of Juror 2723471. [Citation.] The court may have made a sincere attempt to assess the Wasco rationale, but it never explained why it decided this justification for a discriminatory purpose. Because the prosecutor's reason for this strike was not self-evident and the record is void of any explication from the court, we cannot find under these circumstances that the court made a reasoned attempt to determine whether the justification was a credible one." (*Gutierrez, supra*, 2 Cal.5th at pp. 1171–1172.)

The Supreme Court also addressed comparative analysis under *Batson/Wheeler*, when the court engages in a comparison between a challenged panelist and similarly situated but unchallenged panelists who are not members of the challenged panelists protected group. (*Gutierrez, supra*, 2 Cal.5th at p. 1173.) The trial court engaged in a very limited comparative analysis.

On appeal, the defendants had requested the Court of Appeal to perform a comparative juror analysis. However, the appellate court

13

declined to do so reasoning: " '[W]e do not engage in a comparative analysis of various juror responses to evaluate the good faith of the prosecutor's stated reasons for excusing a particular juror "because comparative analysis of jurors unrealistically ignores 'the variety of factors and considerations that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar.' " ' " (*Gutierrez, supra*, 2 Cal.5th at pp. 1173–1174.)

The Supreme Court found this error: "We are mindful that comparative analysis is subject to inherent limitations, especially when performed for the first time on appeal. [Citation.] But it was error for the Court of Appeal to categorically conclude that a court should not undertake a comparative analysis for the first time on appeal—regardless of the adequacy of the record. The Court of Appeal also erred in declining to review the panelist comparison that had been made by the trial court, the comparison between Jurors 2510083 and 2861675. We overrule *People v. Johnson*[ (1989) ] 47 Cal.3d 1194 to the extent it is inconsistent with this opinion." (*Gutierrez, supra*, 2 Cal.5th at p. 1174)

Mindful of *Gutierrez*, we consider Bristow's *Batson/Wheeler* argument.

As the parties acknowledge, it is somewhat unclear whether the trial court determined Bristow made a prima facie showing. The trial court did not make a specific finding that Bristow made such a showing but did ask the prosecutor to explain his reasons for excusing the jurors in question.

In *Hernandez v. New York* (1991) 500 U.S. 352 [114 L.Ed.2d 395], after the defendant raised a *Batson/Wheeler* objection, the prosecutor did not wait for a ruling on whether the defendant had established a prima facie case of racial discrimination. The prosecutor instead volunteered his reasons for striking the jurors in question. The Supreme Court observed: "[T]he trial court had no occasion to rule that petitioner had or had not made a prima facie showing of intentional discrimination. ... Once a prosecutor has offered a race neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant made a prima facie showing becomes moot." (*Id.* at p. 359; *see also People v. Scott* (2015) 61 Cal.4th 363, 393.) Accordingly, we consider the prosecutor's response to the court's request.

Here, the court invited the prosecutor to explain why N.C. had been excused. After the prosecutor responded, the trial court observed: "Since you mentioned [R.G.], I invite you to explain why [R.G.] was excused." As for E.S., the court stated, based on the potential juror's answers, the prosecutor had a legitimate reason to excuse E.S.

## N.C.

Bristow argues the prosecutor did not pose a single question to prospective jurors R.G., E.S., or N.C. before challenging them. As for N.C., Bristow contends the prosecutor offered no reason

whatsoever for challenging the juror; "The prosecutor simply claimed her answers were 'so benign' he could not say whether she would be a good or bad juror for the prosecution." Bristow oversimplifies the record.

N.C. was the prosecutor's seventh peremptory challenge and the prosecutor explained that he was exercising the challenge because N.C.'s responses, in the limited time permitted, provided no indication of how she would respond to the evidence. The prosecutor did not want to waste any additional of "our finite amount of time in trying to hash out one way or another." The trial court considered the explanation and found the reason N.C. was excused, "while it nonplusses me a bit, has nothing to do with race. I don't find the explanation offered ... is simply an attempt to mask the fact that the real reason was that she was Hispanic."

We find the trial court's consideration of the prosecutor's reason for removing N.C. both sincere and reasoned as required under Gutierrez. We give great deference to the trial court's ability to distinguish bona fide reasons for sham excuses. (*People v. Lenix* (2008) 44 Cal.4th 602, 613–614.) The trial court's determination is a factual one, and if the court makes a sincere and reasonable effort to ascertain whether the proffered reasons are nondiscriminatory and the determination is supported by substantial evidence, we will not disturb it on appeal. (*People v. Thomas* (2011) 51 Cal.4th 449, 474.)

Here, the trial court observed voir dire, listened to the prosecutor's explanation, and determined it was not based on the fact that N.C. was Hispanic. Bristow challenges the trial court's decision, arguing several other non–Hispanic jurors also provided limited information but were not excused. According to Bristow, "A comparative analysis shows the prosecutor did not strike non–Hispanic jurors who also provided spare biographical information."

However, the jurors in question were asked additional questions by defense counsel. One juror indicated she had previously served on a grand jury and that her former spouse's drug use would not impact her impartiality. Another juror discussed her work responsibilities, and the third also clarified her work position and stated that although she had visited prisons, she could be fair in the present case. A final juror stated her occupation, place of residence, and the occupation of her spouse.

Bristow argues this additional questioning is a "distinction without a difference. Although they may have been asked a couple of questions more, their answers provided no greater information as to their suitability as a prosecution juror than N.C.'s answers did." As the *Gutierrez* court noted, "comparative analysis is subject to inherent limitations, especially when performed for the first time on appeal." (*Gutierrez, supra*, 2 Cal.5th at p. 1174.) We are faced with only the written record of the voir dire, not the ability to observe and evaluate the potential jurors' demeanors as they answered the questions. Moreover, since Bristow did not raise the issue of comparative analysis in the trial court, the prosecutor never had the opportunity to explain any perceived differences between the N.C. and the excused

jurors. Given the record before us and the deference we show the trial court, our comparison of other jurors does not undermine the trial court's determination that N.C. was excused for non-discriminatory reasons.

**E.S.**

The trial court did not request an explanation for the peremptory challenge against E.S. but accepted the prosecutor's proffered explanation. The prosecutor stated E.S. recalled nothing of his prior jury service, which the prosecutor found problematic. Bristow contends the record does not support the prosecutor's given reason. We disagree.

E.S. stated he had recently served on a jury in a criminal case. Upon further inquiry regarding the charges, E.S. responded, "Somebody got beat up. I don't recall." When asked if the jury reached a verdict, E.S. stated, "I believe so." E.S.'s vague responses concerning his jury service support the trial court's finding of a lack of discriminatory intent in his dismissal.

Other prospective jurors questioned about previous jury service were able to provide more specific, detailed descriptions of the issues under consideration, and if verdicts, or in one case a settlement, had been reached. Our comparison of these jurors with E.S. does not cast doubt on the trial court's conclusion that the reason for dismissing E.S. was nondiscriminatory.

**R.G.**

The prosecutor excused R.G. in part because her facial expressions gave the impression she was "completely confused almost to the point of [being] disoriented about what was going on." In addition, the prosecutor noted that R.G. worked for an agency that had an often acrimonious relationship with his office. Bristow argues the reasons given "do not withstand scrutiny."

However, both of the reasons given, the juror's demeanor and her adverse relationship with the district attorney's office, support the trial court's finding of a nondiscriminatory reason for R.G.'s dismissal. The demeanor of a juror may be a valid basis for a challenge, provided the demeanor-based reason is not pretextural. (*People v. Jones* (2011) 51 Cal.4th 346, 363–364) Excusing a juror based on the juror's professional background may be a valid reason for exclusion. (*People v. Granillo* (1987) 197 Cal.App.3d 110, 120, fn. 2.) Bristow does not argue any comparable jurors were not excused. We find sufficient evidence supporting the trial court's conclusion that the prosecutor's reasons for excluding R.G. were neutral and valid.

(ECF No. 21-28 at 21–32); <u>Stearman</u>, 2018 WL 1614701, at *11–17.

## II.    Discussion

The Equal Protection Clause of the Fourteenth Amendment prohibits litigators from

16

exercising peremptory challenges on the basis of race. <u>Batson v. Kentucky</u>, 476 U.S. 79, 86

(1986); <u>see also</u> <u>People v. Wheeler</u>, 22 Cal. 3d 258 (1978). To determine whether a peremptory

strike was discriminatory, courts apply a three-part inquiry:

> First, a defendant must make a prima facie showing that a
> peremptory challenge has been exercised on the basis of race;
> second, if that showing has been made, the prosecution must offer a
> race-neutral basis for striking the juror in question; and third, in light
> of the parties' submissions, the trial court must determine whether the
> defendant has shown purposeful discrimination.

<u>Davis v. Ayala</u>, 576 U.S. 257, 270 (2015) (quoting <u>Snyder v. Louisiana</u>, 552 U.S. 472, 476–77

(2008)). The defendant bears the burden of persuasion regarding racial motivation. <u>Purkett v.</u>

<u>Elem</u>, 514 U.S. 765, 769 (1995) (per curiam). The prosecutor need only provide a legitimate

reason for using his strike, meaning "a reason that does not deny equal protection." <u>Id.</u>

(concluding that unkempt hair is race neutral and satisfies the prosecutor's burden); <u>see also</u>

<u>Hernandez v. New York</u>, 500 U.S. 352, 360 (1991) (plurality opinion) ("Unless a discriminatory

intent is inherent in the prosecutor's explanation, the reason offered will be deemed race

neutral."). For step three, the trial court's finding on the credibility of the prosecutor's race

neutral explanation is a factual one that is "entitled to 'great deference.'" <u>Felkner v. Jackson</u>, 562

U.S. 594, 598 (2011) (per curiam) (quoting <u>Batson</u>, 476 U.S. at 98, n.21); <u>Purkett</u>, 514 U.S. at

769; <u>Davis</u>, 576 U.S. at 285 (noting that the trial court's determination of the nature of the

peremptory challenges is "difficult" and "often based on subtle impressions and intangible

factors"). A comparative juror analysis is one tool that courts can use to determine whether a

prosecutor's race neutral explanation is a pretext for discrimination. <u>Miller-El  v. Dretke</u>, 545 U.S.

231, 241 (2005).

On direct appeal, the trial court's findings are reviewed for clear error. <u>Rice v. Collins</u>,

546 U.S. 333, 338 (2006). But more is required under AEDPA. "A federal habeas court must

accept a state court finding unless it was based on 'an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding." <u>Davis</u>, 576 U.S. at 271 (quoting 28

U.S.C. § 2254(d)(2)); <u>see also</u> <u>Miller-El</u>, 545 U.S. at 240; <u>Briggs v. Grounds</u>, 682 F.3d 1165,

1170 (9th Cir. 2012). "State-court factual findings, moreover, are presumed correct; the petitioner

1    has the burden of rebutting the presumption by 'clear and convincing evidence.'" <u>Rice</u>, 546 U.S.

2    at 339 (quoting 28 U.S.C. §2254(e)(1)).

3        Here, the trial court held a hearing on petitioner's <u>Batson</u>/<u>Wheeler</u> motion. The prosecutor

4    explained his race-neutral reasons for the challenged strikes, and the trial court concluded that the

5    prosecutor's strikes were not pretextual. (ECF No. 21-7 at 124–30.) Petitioner appealed. The state

6    appellate court reviewed the trial court record and upheld the trial court's determination, noting

7    that the trial court had observed voir dire, evaluated the prosecutor's reasons, and found it to be

8    race-neutral. (ECF No. 21-28 at 32.) Now on federal habeas review, the relevant inquiry before

9    this court is whether the state appellate court reasonably determined the facts under 28 U.S.C. §

10   2254(d)(2). <u>Sifuentes v. Brazelton</u>, 825 F.3d 506, 517 (2016).  After reviewing the record, this

11   court concludes that the state appellate court's decision was not objectively unreasonable. (ECF

12   Nos. 21-7 & 21-15.)

13       **A.  Prospective Juror N.C.**

14       The prosecutor used his seventh peremptory strike on N.C. During the hearing, he stated

15   that N.C. was employed as the director of Head Start, and her husband worked for a rental

16   agency. (ECF No. 21-7 at 125.) The prosecutor explained that he exercised a strike on N.C.

17   because "none of the answers she provided…gave any kind of reading of how she would vote one

18   way or the other." (<u>Id</u>.) Her answers were so "benign," the prosecutor continued, that the state did

19   not wish to "waste any additional of our finite amount of time in trying to hash out one way or the

20   other." (<u>Id</u>. at 126.) The trial court determined that, while the reason N.C. was excused

21   "nonplusses me a bit, [it] has nothing to do with race. I don't find that explanation offered by [the

22   prosecutor] is simply an attempt to mask the fact that the real reason was that she was Hispanic."

23   (<u>Id</u>. at 130.)

24       The state appellate court agreed with the trial court, finding that the prosecutor's reason

25   for removing N.C. was "sincere and reasoned" and "supported by substantial evidence." (ECF

26   No. 21-28 at 30.) On habeas review, the state court's factual findings are entitled to great

27   deference. <u>Felkner</u>, 562 U.S. at 598. This court must presume that those factual findings are

28   correct, and the petitioner has the burden of rebutting that presumption with clear and convincing

1    evidence. Rice, 546 U.S. at 339 (quoting 28 U.S.C. §2254(e)(1)).  Although petitioner attempts to

2    rebut this presumption by claiming that other similarly situated prospective jurors were not

3    stricken, his argument fails. (ECF No. 1 at 17–18.) The state appellate court engaged in a

4    comparative juror analysis (for the first time on direct appeal) and concluded that those jurors

5    provided more information to the court and parties than N.C. did (ECF 21-28 at 30–31; see also

6    ECF No. 21-7 at 28–29, 34, 41–44, 52–53, 62–63, 68.) In light of the record, standard of review,

7    and the fact that petitioner did not raise this issue before the trial court, this court concludes that

8    state court's finding that N.C.'s excusal from the jury was non-discriminatory was not objectively

9    unreasonable.

10        **B. Prospective Juror R.G.**

11        The prosecutor provided several reasons for striking prospective juror R.G. First, the

12   prosecutor explained that "her facial expressions brought to me that she was completely confused

13   almost to the point of disoriented about what was going on." (ECF No. 21-7 at 126.) Second, he

14   noted that she works for the Department of Employment and Social Services, which has an

15   acrimonious relationship with the District Attorney's office. (Id.) In his 16-years of experience,

16   the prosecutor stated that "there have been times where [Department of Employment and Social

17   Services] has actually complained that badge-carrying, gun-carrying district attorney investigators

18   are assigned to that office, and those investigators work for my office." (Id. at 126–27.) Lastly, he

19   noted that R.G. is employed as a senior analyst and has found that analysts "tend to be too fact

20   wanting or too detail specific and are not good as jurors in cases where some of the evidence

21   produced is going to be circumstantial evidence" like in this case. (Id. at 127.) The trial court

22   found that the reasons for striking R.G. "certainly makes sense." (Id. at 130.)

23        The state appellate court concluded that the "the juror's demeanor and her adverse

24   relationship with the district attorney's office, support the trial court's finding of a

25   nondiscriminatory reason for R.G.'s dismissal." (ECF No. 21-28 at 31.) The court reasoned that

26   the juror's professional background and demeanor are valid bases for challenge, assuming those

27   reasons are not pretextual. (Id.) This court agrees with that finding. It is well-established that a

28   prosecutor may excuse a prospective juror based on the juror's professional background or

demeanor. <u>See, e.g.,</u> <u>Collins</u>, 546 U.S. at 341; <u>United States v. Maxwell</u>, 473 F.3d 868, 872 (8th Cir. 2007); <u>United States v. Thompson</u>, 827 F.2d 1254, 1260 (9th Cir. 1987) ("Excluding jurors because of their profession…or because of a poor attitude in answer to voir dire questions is wholly within the prosecutor's prerogative."); <u>Housh v. Cueva</u>, No. 17-cv-04222, 2021 WL 428628, at *12 (N.D. Cal. Feb. 8, 2021). The state appellate court, therefore, reasonably concluded the trial court's factual finding that the prosecutor's explanations for excusing R.G. were race-neutral.

### C. Prospective Juror E.S.

The prosecutor explained that he struck E.S. because of his vague answers related to a prior jury service. (<u>Id.</u> at 129). When the court asked him what the criminal charge was, E.S. did not recall and stated that "[s]omebody got beat up." (ECF No. 21-15 at 17–18.) Although he admitted to being involved in the deliberation process, E.S. was not sure if the jury reached a verdict. (<u>Id.</u> ("I believe so."). The prosecutor told that court that he found E.S.'s vague recollection "problematic" because the state is looking for jurors who are "going to be paying attention and be engaged." (ECF No. 21-7 at 129 ("I have no idea what kind of case that was, but with only one prior event of jury service, I would expect something to stick out of his mind").) The trial court concluded that "the reason Mr. Salcedo was excused clearly has nothing to do with race." (<u>Id.</u> at 130.)

The state appellate court agreed that E.S.'s vague responses supported the trial courts decision. (ECF No. 21-28 at 31–32.) This court concludes that the state appellate court's factual findings were not unreasonable. Peremptory strikes may be used over concerns about a prospective jurors' attentiveness or attitude towards the judicial proceedings. <u>See, e.g.,</u> <u>U.S. v. Velasquez</u>, 750 F. App'x 597 (9th Cir. Feb. 6, 2019); <u>U.S. v. Changco</u>, 1 F.3d 837, 840 (9th Cir. 1993) (Petitioner "does not contest that the prosecutor may strike potential jurors for their passivity, inattentiveness or inability to relate to other jurors, nor could he: We have repeatedly upheld these reasons as valid, race-neutral explanations for excluding jurors.") The prosecutor's stated explanation was, therefore, not discriminatory.

Petitioner argues that other prospective jurors were similarly vague about their prior jury

service but were not stricken. (ECF No. 1 at 18, 20–21.) But the state appellate court applied a comparative juror analysis and found to the contrary.

> Other prospective jurors questioned about previous jury service were able to provide more specific, detailed descriptions of the issues under consideration, and if verdicts, or in one case a settlement, had been reached. Our comparison of these jurors with E.S. does not cast doubt on the trial court's conclusion that the reason for dismissing E.S. was nondiscriminatory.

(ECF No. 21-28 at 32.) That finding is consistent with this court's review of the record, which shows that the other six prospective jurors had more detailed and substantive recollections of their prior jury service. (ECF No. 21-15 at 18–21.). Petitioner provides no meritorious argument to assuage the prosecutor's concern over E.S.'s vague responses. This court recommends finding that the state appellate court's findings as to E.S. were not objectively unreasonable.

In summary, although even one discriminatory strike would violate the Constitution, Batson requires courts to consider the all the relevant circumstances when assessing these challenges. Batson, 476 U.S. at 96. Here, the prosecutor also noted that, despite the three challenged strikes, four prospective jurors with Hispanic surnames remained in the jury pool. (ECF No. 21-7 at 127–28.) Although the court agreed with defense counsel that this fact is "legally irrelevant," it is "not immaterial. It is simply not conclusive." (Id. at 128.) Accordingly, the state appellate court's rejection of petitioner's claim was not based on an unreasonable determination of facts in light of the evidence presented in the state court proceeding. This court recommends denying habeas relief.

## CONCLUSION

Petitioner fails to meet the standards set out in 28 U.S.C. § 2254(d) by showing the state court decision on any claim was contrary to or an unreasonable application of clearly established law as determined by the Supreme Court, or resulted in a decision based on an unreasonable determination of the facts.

Therefore, it is RECOMMENDED that petitioner's petition for a writ of habeas corpus (ECF No. 1) be denied.

////

21

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served on all parties and filed with the court within seven (7) days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991). In the objections, the party may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed. See Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Furthermore, State of California was previously named as the respondent. Martin Gamboa is acting warden at Avenal State Prison, where petitioner is incarcerated. "A petitioner for habeas corpus relief must name the state officer having custody of him or her as the respondent to the petition." Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir.1994) (citing Rule 2(a), 28 U.S.C. foll. § 2254). Accordingly, the court GRANTS respondent's request to substitute Martin Gamboa as respondent in this matter.

Dated: November 19, 2021

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE